Miller v. Yokohama Tire. Are counsel prepared? Counsel, you may proceed. Good morning, Your Honors. I'd like to indicate that I'd like to save three minutes for rebuttal, please. May I do so? Perhaps the most frequently heard refrain in RICO litigation is, it's just another garden variety torch. And I've been on the defense side in which that same issue was raised. And the courts have been constrained to follow the law regardless of what their personal reaction to RICO generically might be. And in this instance, we've pled the elements. We've got a mail fraud scheme, pure and simple, to deprive employees of their overtime. The only problem that you may have, and we'd like to hear you discuss it, is the fact that you joined the corporation as a defendant. Yes, Your Honor. It was not joined as a person. We wanted to raise the issue to present it for the Court and to save for appeal as to whether or not an enterprise may be liable under grounds of ratification and or respondeat superior. The Supreme Court in Cedric Kushner has expressly stated that it has not yet decided the issue of respondeat superior liability. If the Court, if it is Court's determination that an enterprise may not under any circumstances whatsoever have any RICO liability, then it does not affect the liability of the individuals who are perpetrating the acts. So the authority that can permit you to proceed with the corporation still joins? I don't know of any authority that says that we may not proceed, Your Honor. The appropriate, in our view, the appropriate relief would be if the Court feels that there is absolutely no RICO liability under any circumstances for the enterprise, it would be to dismiss the enterprise as a defendant and to proceed. Is your contention that the corporation is the enterprise? That's correct, Your Honor. And that the individual defendants are the conspirators? That's correct, Your Honor. But here's what bothers me. First of all, we do not have any authority that pure respondeat superior is enough for a case under RICO. And it seemed to me in going over the materials that I had, maybe you can disabuse me of them, that in every instance what was done toward your plaintiffs was done in the name of and part of and as agent of the corporation by these particular individuals. They were not individually profiting as is the case in a usual RICO case where the corporation is being used as the enterprise. This was all for the corporation. And so I am really hung up in saying what you've alleged here is not a RICO case. You have merely alleged a respondeat superior liability not under RICO but under the statutes for failure to pay overtime. That's the problem I'm hung up on. Yes, Your Honor. On that issue, we have in fact pled that there was a personal benefit to the RICO co-conspirators, that they personally financially benefited. And part of the scheme was that they controlled the way the operation was set up. They set it up through a budgeting procedure in which their compensation was related to a minimization of the wages. And they had a direct incentive to violate the law because they personally benefited. We have alleged that. Well, it was an indirect benefit, though. They didn't get the money, skim the money off. They got the money because they were doing a good job for the corporation and the corporation was making money and it was paying these people more money. That really is your bottom theory then. Well, that's one way of looking at it. Our way of looking at it, Your Honor, is that if one were to accept this as a complete defense to any RICO claim, that would mean that all that racketeers have to do is to set up their operation in the mode of a corporation to follow the rules of accounting even though they are violating the law, even though they are committing repetitive predicate acts, but yet the money is unreachable because the money largely vests with the entity, which continues on, which they control, which they can pull out in the form of wages, which they can pull out in the form of bonuses and other compensation, and that would mean all of them skate. Well, let me tell you another hurdle that I have maybe you can enlighten me on, and that is even if you got rid of the corporation because there wasn't respondeat superior liability and even if you could proceed against the individuals on an allegation of indirect compensation, my difficulty is that it seems to me that under your theory every wage and hour claim is a RICO claim and here to the extent that there is a fraud that might be actionable, it seems to me that that is not tied into the males. So the males are a consequence of it perhaps, but that's not part of the fraud. Would you address that and the cases that relate to, you know, the relationship between the alleged male fraud and the actual fraud? Yes, Your Honor. As to the male fraud issue, it would have been a simple matter to do what had been done for many years before they sought the convenience of mailing checks, give them the paycheck. That had been the standard for many years. Now, the argument would be, well, it's more convenient or we find it more cost effective to use the mail. That is what impacts Federal law. That is what impacts the criminal act. And to claim, well, it really doesn't apply in this circumstance would mean that as long again as one sets up an apparent commercial context, then the use of the mails is no longer a criminal act. You can engage in fraud. Now, on the other issue, which is. See, that begs the question. It's not. Of course they use the mails or the wires. There was a direct transfer, you know, and I hardly know anyone other than the federal government that goes around and hands out checks these days. But they do. The difficulty I have is that the fraud, to the extent that they are doing the calculations and telling the employees that this is how you calculate overtime and this is how you calculate hours, that fraud is complete before they mail, give or send the checks, is it not? Well, no, Your Honor. The fraud continued. The fraud was continued over a period of 11 years in which a series of higher-ups perpetrated the same false representations. Right. There's the fraud. That's the fraud. And the mail, the mail, sending them the check in the mail is not, it's immaterial how they collect the money. Right. Because the fraud occurred before. But under Schmuck v. U.S. Right. And that's what I'm focusing on. Innocent acts done pursuant to the fraudulent scheme nevertheless count as predicate acts. And the issue that you're raising was addressed in Systems Management Inc. v. Loisel, the 91SF-2nd-401-District-Mass-2000. And it was also an employee situation. And they had a slightly different factual scenario in which they were underpaying, misrepresenting the number of hours paid. And the predicate acts, there was one instance of a false statement mailed. Counsel, you're down to about one minute. Yes. And in Systems Management, the other predicate acts were all mailing of paychecks or invoices. And that satisfied the two predicate acts. Thank you, Counsel. You've got about a minute left for your rebuttal. Thank you, Landry. Counsel? Good morning. May it please the Court. Two points in response. Counsel, do you identify yourself for the record, please? I'm James Broderick for the FLE's Yokohama Tire Corporation and the individuals, Messrs. Brennan, McMaster, and Kessel. Thank you. Two points. First, I think the Court is quite correct that respondeat superior doctrine is simply not available in the RICO context. And that is clear by this Court's holding in the Brady case, which we've cited in our brief, where I believe it was Judge Buchheber made it perfectly clear that respondeat superior is simply a way to avoid the structure of 1962C, which makes clear that only the persons who manage or control the operations of the corporation have liability under 1962C. And you cannot bring the enterprise – the enterprise does not have liability for the acts of those persons who control it or manage it under 1962C. It may have liability under different theories of law, such as the state claims that have been raised here, although we think not for other reasons in this instance. But it is not a RICO claim under 1962C. Now, I think that the doctrine of respondeat superior also – it's interesting in this case because it gets you to, I think, a reason why the individuals can't be liable in this case. I think that, curiously enough, by their reliance on – by plaintiff's reliance on the doctrine of respondeat superior, he's essentially pled himself out of a RICO claim as to the individuals. And the reason is that, of course, under 1962C, liability only attaches to those who are in the management or control – who control or manage the operations of the corporation through a pattern of racketeering activity. The doctrine of respondeat superior is a doctrine that is used to attach liability to a corporation for the acts of individuals who are not officers and whose acts would automatically bind the corporation. It doesn't seem to me that would automatically plead him out. It may – there's alternative theories that could be inferred from the pleadings. And if he can't sue the company, why couldn't he sue the individuals on the theory that they are, in fact, the management and that they are, in fact, profiting? Well, I think you do – well, you do have the problem of judicial estoppel in this instance where he has relied on the respondeat superior doctrine. And it seems to me that does apply only in the instance of a non-controlling person with the company. But putting that aside, that gets us to the sort of the second prong of the argument, and that is, is this a fraud for purposes of the mail statute? Maybe you're on the point. I'm wondering, what is racketeering activity with respect to corporations in which the managing people violate some statute? After all, it's never been illegal to employ people and not pay them adequate wages unless it violates a collective bargaining agreement or state law or something. It's not what we think about as racketeering activity, but you don't make any point of that that I've seen or briefed. Well, I quite agree with you in the sense that not every violation of law, assuming there was a violation of law in this instance with respect to the overtime laws, and that remains to be determined in the state court proceeding, but even assuming there was for purposes of this argument, not every violation of a statute, for example, a wage and hour statute, gives you a RICO claim. It can only be a RICO claim if there are actions in furtherance of a scheme or artifice, actions where the mails are used in furtherance of a scheme or artifice to defraud. This is simply a case where the two parties to a contract have a different view of what the contract entails. We say we're not obligated under the contract to pay you, you know, the contract to pay you overtime laws, and the plaintiff says it's the overtime wages, and we make no bones about that. We've said that over and over again. The plaintiff says, yes, you are. That's a deep disagreement over what the contract obligations are, and the plaintiff says the provisions of the wage and hours laws are imported into our employment agreement and, therefore, in your representation of what is entailed in the contract, you've committed a fraud. But that's simply not a fraud in any common law sense of the word. That's a disagreement about what the contractual obligations of the parties are under the contract. It cannot be – and that – you can think of it in a number of different ways. One is – one is the argument that misrepresentations of law, that is the quasi-contractual obligations that the company has under the wage and hours laws are misrepresentations of law, and the law is, as we've cited in our brief, quite clear that misrepresentations of law do not – are not a species of fraud. You can think about it in another way, and that is that what fraud is about is facts on the ground, and this distinguishes the systems management case that plaintiff relies on. In systems management, the RICO claim was brought by competitors of the enterprise for the management having underpaid its workers below the prevailing wage rates, but having represented to the state that it was paying at the prevailing wage rates. In other words, it said it was paying $9.20 an hour when, in fact, it was paying $7.20 an hour. The point about that is that's a fact on the ground. That's not a predictive fact as to what our – what our obligations might be as a matter of law. We made no representations to Mr. Miller that we are paying you $9.00 an hour when we are only paying him $7.00 an hour, and that's the point. He got his check stub every week. He could see what it was. It's a vastly different kind of situation. We told him – Could it be a RICO case, you think? If we told him we were paying $9.00 an hour and we're only paying $7.00? Yeah. I suppose – I suppose it might be if he could – That means that anything could be a – any kind of misrepresentation in the business sense could be a RICO case. Assuming it met – assuming it met all of the other criteria of a 1962 C action, and that is that there was – Well, they're saying that you told us we were – you told us we were independent contractors and we're not covered under the Wage and Hour Law, and that's a lie. We are covered. Now, that may be a factual issue, but we're in a pleading stage, and if you concede as much as you have, maybe you conceded that the 12B6 dismissal was too premature. I think not, Your Honor, because in your hypothetical – and I think it is a hypothetical because that wasn't the representation that was alleged. The representation that was alleged was a salaried employee and therefore not entitled to overtime pay. On the – on your hypothetical of the independent contractor, it seems to me that is exactly what I'm speaking of, a misrepresentation of his legal status, not a representation as to a fact that he is unable to determine for himself. Could this case be turned into a wage and hour claim? Could the complaint be amended in some way to do that? Well, it is. It is in the remanded claims that are in the state court are – Like 18 different claims that are in the state court? Yes, yes. And, in fact, we are litigating hotly and heavily in the state court on those claims. I mean, he has – Wage and hour aspects. Yes, he has his wage and hour aspects. And that really strikes me as the sort of curious thing about his RICO claim. That is, it's entirely dependent on his winning his wage and hour claims, not on a legal point, not on any independent facts that could be established. And it would seem to me anomalous for this court to keep alive under these circumstances a RICO claim that is, as I said, entirely dependent on the outcome of a state law proceeding that's going on quite apart from whatever would go on in the Federal Court. I see that I've probably approached my 10 minutes. If the Court has no further questions. No further questions. Thank you, Counsel. Thank you. Ms. Altanaga. Thank you, Your Honor. On one brief point, Counsel is just wrong on the issue that you can't have respondeat superiors through a director and officer. And if the Court will permit, I can just submit a simple citation. That was, I believe, inadvertent misstatement of the law. Do you have the citation today? No, but I can submit it by post. All right. We'll defer submission until you do that. Thank you. We'll give you seven days from today. Very good, Your Honor. Thank you. As to the issue of the post-fraud activity, another case we cited was United States v. Grandi, 620F, second 1026, which also involved partial payments being made after the so-called fraud had been completed and the court had discussed. We have another issue, which is the argument that somehow these people aren't in control. The defendants. We've shown their capacity, their officers, vice presidents, managers, and counsel would have it two ways. First to say that, well, there's no respondeat superior, but on the other hand, these people aren't in control, and yet they are officers, directors, managers who are in the direct line, and they controlled the issue at hand, which was payment. The last point is. Thank you, counsel. Very good. Just one last point. You're about half a minute over time. The simple point is that false representation was not about an analysis of overtime. It was you don't get overtime because you're on salary. That's a false representation. Thank you. Thank you very much, counsel. The case just argued will be submitted in seven days pending the submission of an additional citation by counsel. Thank you, Your Honor. Thank you, Your Honor. The next case for argument will be James v. Mitchell. Good morning, Your Honor. Steven Gilbert appearing for Petitioner Appellant and Petitioner. This is a case I was talking to counsel for respondent and kind of joking that we should just ask the court what they'd like to hear because we feel we've been fighting over this case for years now and have briefed it repeatedly. But there's just a couple of things that I would like to say. First, that Lilly v. Virginia, which is the controlling Supreme Court authority in this area, has been celebrated by defense counsel in various publications about how wonderful this opinion was. And it's been apparently, if not equally, at least to a certain extent, celebrated by prosecutors who say, well, look, Lilly's just a plurality opinion. There's only four judges said this and two judges said this or justices and three said this. In our view, while Lilly is not as clear as we'd like it to be, it seems clear that there are four justices who would say that what happened here violated the Confrontation Clause. That would be the justices. Okay. Does this work? Okay. All right. Thank you. The question we have is the concurring and dissenting opinions on Lilly. And in our view, all of the justices who wrote on this issue in Lilly would be troubled by what happened here. I mean, here we have a suspect who is told by a lawyer that nothing you tell me will be told to anyone. The defendant or the accused says, not even my mother? And he says, no, no one, not even your mother. No one will know what you tell me. And then he says, all right, well, I committed the crime and Mr. Gilbert's client helped me. He doesn't know the client's name, but the wife, he calls her. The prosecutor then comes up with the novel argument that, well, this was a declaration against penal interest because everyone knows that what you tell your lawyer in confidence exposes you to criminal prosecution. Now. Yeah, but that's not the basis on which the California courts said this did not violate the confrontation clause. No, they said it was reliable. Yes. Right. Well, but why do we have to worry about whether a statement against penal interest is a well-recognized exception to the hearsay rule to be admissible contrary to the regardless of the confrontation clause? Well, if it is, I'm not saying that you have to worry about whether it's a well-recognized exception because the Supreme Court has said it's not. The question is whether there are sufficient indicia of reliability here that even though it's not well-recognized, this Court can say, well, it doesn't matter that it's not recognized because the circumstances here were so particularly reliable, unlike a normal statement that one might overhear. You're arguing it was not reliable. I'm arguing that it was far from being reliable. You're arguing what? That it is far from being reliable. Well, you know, there could be a good difference of opinion. And the California courts seem to think that all of the circumstances, speaking to a lawyer, that he would be telling the truth. And if there's a difference of opinion under the ADP or whatever initials they have, you lose. Well, the question is whether when the California courts said, these facts that we're looking at here are sufficiently reliable to meet the Sixth Amendment test, that that was a reasonable or unreasonable application of the Supreme Court's consistent holdings in this area. There are not only the cases such as Roberts which define what the standard is, but you have even in the Chief Justice's discussion in Lilly, he says that this kind of statement that we're at issue here is not even, it is not even sufficient to qualify as a declaration against penal interest. The declarations against penal interest have traditionally been viewed as reliable because the idea is that he's not going to say, well, yeah, I committed the crime to someone who was likely to report him to the police and send him to prison. Well, it seems to me that the difficulty is that we haven't really had something in this context that's a private to an attorney. And the reason is because who could have imagined then the guy would go out and be dead and not avail, you know, and that the attorney privilege would be waived by the mother, I guess. Well, even worse, that the attorney would tell the police what his client told him. Right, but then the privilege is waived. Otherwise, it wouldn't have been able to come in. The judge explains that to the jury. So it's such a bizarre circumstance. It seemed to me that what we're left with is really trying to figure out, take Lilly as a given and the four justices that you nicely laid out in your brief. Was it unreasonable for the California courts to say that this was trustworthy? And while we all know that sometimes defendants are not 100% reliable with what they tell their attorneys, you have a sort of an unusual situation here, as you know, with a civil attorney interviewing the client in a certain way and you have a series of events that go on. And the court looked at those and said, given that, and then given that he says, look, and I'm not going to testify, believe me, I'll die before I testify or something to that effect, which he did. They made a judgment that it was trustworthy. And I'm a little hard-pressed to understand why we would countermand that. What do you think, I guess, what are the best indicia you think that we would look at to say it's untrustworthy or that there's cases that would guide us? Well, firstly, I think that according to the Supreme Court teachings in this area, the presumption is these statements don't come in unless they can be shown to be trustworthy. In my view, and it may be that we've reached the point now where there is no practical review under AEDPA, that anything the State court says goes unless it's just, I mean, Justice or Judge Kaczynski was talking in the action case about good enough for government work. You know, maybe as long as it's just not ridiculous, we allow it. And I unfortunately have had lost cases here where it was close to that. You know, it's like we're a judge at arguments as well. The State court just got this wrong, didn't they? And I don't think it's so unreasonable. I don't think it's so unreasonable, the application of clearly established Federal law. That's fairly easy to deal with, is it not? Except that, in my experience, nobody ever says that there is such a thing. Well, no, we have cases where we have made that determination. So the question here is, you know, why is it unreasonable to say that this was trustworthy? This was a pretty unusual set of circumstances. And your instinct in looking at it is, yeah, it looks like more than most co-conspirator statements that this would be trustworthy.  I mean, first of all, the reason for trustworthiness is that you don't say something unless it's true because you'll go to prison for it. Why would you risk prison if it weren't true? Here, it looks like what happens is that the George Taylor, the shooter, he tried a couple of stories here. First, he told the lawyer he wasn't there, he didn't know anything. The lawyer rejected that one. Then he told him another story. And we just don't have enough circumstances to see how many further stories he might have told. The standard here is whether this statement is so clearly trustworthy that cross-examination would be superfluous. And in our view, I mean, speaking as an ex-trial lawyer, I would love to examine George Taylor about the basis for his statements. I mean, he apparently had never met my client, and yet he talked about my client wanting. Well, how do you know that, Mr. Taylor? Well, you know, somebody told me. You know, we don't know the basis for this. Our brief describes the hearsay dangers that are all present in this case. And finally, I'd like to just say that, you know, I wish Judge Kleinfeld were here because I think what he said in Clark versus or Miranda versus Clark County about criminal defendants lying for their lawyers. I spoke to counsel about that. You know, I said he wasn't privy to the letters I get from clients when he talks about how what clients tell lawyers might be liable. And I'll leave it to him to defend the veracity of what clients tell their lawyers. But, I mean, clients are constantly trying out stories. And finally, what we have here, although everybody seems to slough it off, is the kind of burden-shifting justification in his statements. The, well, you know, I did it because he was an abusive husband. You know, it wasn't my idea. It was Shelby's idea. The wife let me in. You know, it was sort of like it wasn't my idea, which is part of what Mark Lilly said in the statement that the Supreme Court said was inadmissible. You know, I didn't shoot him. I was there. I was drinking. It wasn't my idea. And if I have time left, I'll reserve it. And if not, I'd ask for a minute. Thank you. Thank you. Good morning, Your Honor. Scott Taylor, Deputy Attorney General for the respondent in this case. You know, we've had five different courts who have looked at this issue, five different courts who have reviewed the statements under very clear-cut precedent. The issue is whether there were particularized guarantees of trustworthiness in this case. And five different courts under that very clear standard who have decided, yes, it met all of these. Now, this court, under similar circumstances, and I say not as persuasive a circumstance as in this case, have found that statements such as this come in, both in Padilla and Boone, said in a private setting, which seems to be the problem that counsel has with this, that it's a private setting, so it shouldn't really meet the Declaration Against Interest standard. But in both Boone and Padilla, one of the main reasons that this court said it was reliable was it was made in a private setting, one to the declarant's girlfriend, the other one to a friend. And in both of those cases, they said it's reliable because this person never expected this to be passed on to anybody. Now, aren't there a lot of other corroborating circumstances which you look to see whether this is probably reliable? Well, Your Honor, I think... I don't mean of the right there at the conversation. I mean of the crime itself that tied in Miss James some way. Well, I think under the Lilly case, the plurality, of course, we would say that's only four justices. But I think in Lilly, they suggested that you could not use other evidence that was admitted in order to corroborate a statement, that the statement and the circumstances of the giving of the statement has to stand on its own. So obviously, we would think that it's corroborated, but you don't look at that. But if you look at the statement in Lilly with the statement here, they're at opposite extremes. I mean, in Lilly, you have somebody who's completely minimizing, shifting the blame, saying, well, I was only involved in stealing the beer. I was drunk. The police were interrogating him late at night. He was saying it was his brother. It was the other friend. George Taylor basically said to his lawyer, first, I wasn't there, and then the lawyer said, nobody's going to believe that. All right, I was there, and I shot the guy in the head, and here's how I did it, and here's why I did it. He doesn't try to shift the blame. Counsel misrepresents the statements in terms of that he's trying to place the blame on the wife or the Shelby Harris. He never does that. He's just explaining to them, here's how I did it. I was going to leave the door open so I could get in, and she gave her husband cough medicine. I would do anything for Shelby because she's a friend of mine, and although she said she'd give me money, I don't even want the money, and I'll never testify against him. I did it. He never said they planned it with me. I'm not really that much to blame. My conduct is minimized. Nothing like that. So if you can assume, as you did in Boone and Padilla, that statements that are self-inculpatory but also include some statements that inculpate a defendant come in under certain circumstances, then you'd have to look at these statements in this case and come to a conclusion that the other five courts already did, which is it's reliable. The difference here in Boone and Padilla is the attorney, which is not an insignificant wrinkle, I think you would agree, because he's not talking to somebody outside where if he makes the declaration, as they say, the unabashed confession, that he knows something's going to happen. He's talking in free form to his attorney. So how do we know which of those statements is reliable and what's not reliable? Well, first of all, five other courts didn't have any problem coming to that conclusion, and I think when you look at the circumstances, and the cases have always emphasized the circumstances. He walks in immediately, doesn't know this guy, and says, I smoked pot with these guys when I was in the Orange Grove, and the attorney says, that's not going to fly. Then he goes into this long description of what actually happened. And I think when you look at that, when you read that transcript, when you look at those circumstances, you say, yeah, that's what happened, of course that's what happened. And he describes details like how he got in, how he went over there, takes complete credit for everything that he did. And in both Boone and Padilla, in one of those cases, I think it was Boone, it's a girlfriend. So I don't really see that there is much of a distinction between a private setting to a close friend, or to a girlfriend, or to an attorney. Because essentially what you're saying is you're telling them, under circumstances that you're hoping is not going to be repeated. And certainly this court doesn't have to reach the declaration against interest issue, because we're here on the federal constitutional issue of whether there's an issue of reliability. And as five other courts have said, if you look at this statement, and all the surrounding circumstances, you have to come to a conclusion that this is here in terms of reliability. And Lilly's statements were way over here. And everything that Lilly talked about in terms of blame shifting, minimizing, in terms of what this court has said, which I think is a great comment, unabashedly inculpated himself. That's exactly what George Taylor did. I can't imagine anyone who could be more unabashed. So unless the court has any other questions, I'll submit. Thank you, counsel. Mr. Gilbert, you have less than a minute, so speak fast. Okay. First of all, private and privilege are not the same thing. I mean, when you tell somebody something, the phrase false friend comes to mind. I mean, you know, if I tell you something and I think you're my friend and, in fact, you're working for the police, that's unfortunately a risk we take in today's society. But if you tell me you're my attorney and nothing I tell you will ever be told to anyone, that's an entirely different situation. This attorney was not following the usual dance. I don't know. This may be before your time. Maybe not. There's a great movie. Anatomy of a Murder. Anatomy of a Murder with Jimmy Stewart. Do you remember that scene where the defendant and the lawyer do the dance in order that the lawyer doesn't tell the defendant what his defense is, but in effect does? I thought reading this case brought back that situation of mine. It isn't quite the same. It's kind of the converse. See, I think I cited it in one of my briefs in the State Courts, that very scene in the book and in the movie. I think that's right. But I think that the counsel says that this Court doesn't have to care about whether this was a declaration against penal interest. I think that while technically that's not true, that the rationale, the reason that these statements get to be admitted, is that the rationale behind the declaration against penal interest rule is that this kind of statement tends to be reliable. That's why state legislatures and the Congress, or wherever it is, are looking at it. Well, the odd thing here is that for the very reason that it's privileged, doesn't that also give it some veneer of reliability? In other words, the rug gets pulled out from under him after he dies, but the lawyer basically says, look, this will never be used against you. You can tell me. You can tell me. Now, you know, he may have been a poor defense lawyer. Most of us wouldn't have done that in defending criminal defense. But he said, you can tell me. And the guy did. So if you look at it in that context, maybe it's more trustworthy than your average confession to a friend. Maybe. But just to end, I will say that that's not been my personal experience in practicing criminal law. And the only authority I could find was the paragraph from Judge Kleinfeld, which talks about defendants lying to their lawyers for no reason at all. Thank you, Counsel. Thank you. The case just argued will be submitted for decision.
judges: Bright , O'scannlain, McKeown